**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

CapitalWorks, LLC,
3 Bethesda Metro Center
Suite 700 – PMB 70070
Bethesda, MD 20814

Plaintiff,

v.

Sona International Corporation; Sona Laser Centers, Inc., James H. Amos, Jr.; Heather Rose; Thomas R. Noon; Dennis R. Jones; Cookie Jones, Carousel Capital, Inc.,

Defendants.

**AMENDED COMPLAINT AND JURY DEMAND**

Civil Action No. 8:05-cv-01804-PJM

Plaintiff, CapitalWorks, LLC ("CapitalWorks"), by its attorneys Neuberger, Quinn, Gielen, Rubin & Gibber, P.A. and Dady & Garner, P.A., for its amended complaint against Defendants, alleges as follows:

## NATURE OF ACTION

1. Plaintiff, a franchisee of Sona Laser Centers, Inc. ("SLC") brings this action to recover damages, costs and attorneys' fees on account of Defendants' fraudulent sale of laser-based cosmetic treatment franchises for hair removal and skin rejuvenation.

2. Defendants, purporting to capitalize upon advances in laser technology and the immense and growing market for procedures to enhance personal appearance, represented to CapitalWorks and its owners that they had a proven, proprietary, patent-pending system for permanent removal of all types and colors of unwanted hair that was

fast and cost-effective; Defendants claimed that their "Sona Laser Centers" had a proven operating model; produced 55% margin after a break-even of $50,000 in monthly sales; and that because of SLC's proprietary treatment systems, products and technology, had a substantial advantage over all competitors. Defendants further told CapitalWorks that they would provide hundreds of thousands of dollars in tested and proven advertising materials that would allow CapitalWorks to quickly dominate the market; that they would continue to produce hundreds of thousands of dollars in additional advertising materials each year without additional charge; that they had "world class customized software applications" that would ensure the smooth operation of the franchisee businesses; that they had the most up-to-date, cutting-edge laser technology selected by their medical director after extensive and comprehensive testing; and that franchisees would receive ongoing support and advice. In reliance on these and other representations, CapitalWorks and its principals invested in excess of a million dollars to acquire the rights to Sona Laser Centers in the Washington, DC metro area and open their first Sona Laser Center. After opening this first center, CapitalWorks discovered that the Defendants had misrepresented virtually every aspect of the business: SLC's pending patent was for only a very narrow aspect of laser treatments with no long-term value as intellectual property; their "proprietary" hair removal process was in fact based on a longstanding (1986) publicly available clinical study taught in electrology schools for almost two decades; they could not treat all hair colors or hair types effectively; they could not achieve the level of results or efficacy purported for permanent reduction of hair in the prescribed number of treatments; they had not conducted a comprehensive, documented or properly administered review of

available laser technology; they had not properly disclosed the ownership stake in the franchisor held by their laser supplier, a stake which put Sona in an obviously poor strategic position and made the franchise an obviously poor investment; and no current Sona Laser Centers in operation had achieved the financial performance represented by the Defendants. The system was not proven – in fact company-owned stores were losing money or, at best, breaking even at the time Defendants were telling the franchisees that they were successful; laser treatment centers did not achieve profitability at a $50,000 break-even level, but in fact generated immense liabilities; the advertising materials provided to franchisees were in fact unusable due to amateur quality of design; the software provided by Sona was inadequate and counterproductive, necessitating the hiring of additional staff to supplement with manual record-keeping; the advertising materials, sales scripts and training materials provided by Sona included false claims regarding the efficacy of its treatment processes; the laser technology selected by Sona was not reliable for the purposes of a high volume laser hair removal business; and the use of these inadequate lasers further required franchisees to invest tens of thousands of dollars on otherwise unnecessary infrastructure such as additional air conditioning and augmented electrical systems. In addition, Defendants failed to provide the training, technical, operational and promotional support that they had agreed to provide. In April, 2004, James H. Amos, Carousel Capital, Inc. and Heather Rose took over SLC and SIC (the "Amos Defendants") and told CapitalWorks and other franchisees that they were going to build the Sona franchise system aggressively, make "Sona" a household word and make SLC a public company. They specifically deflected CapitalWorks from its complaints,

indicating publicly that they had full confidence in the Sona model, knew exactly what they were offering, and that any underperformance of a Sona location was solely a function of operator error. Based on these assertions and the Defendants' reassurances regarding the soundness of the Sona model, CapitalWorks purchased its second Sona Laser Center franchise location from the Defendants, including Amos and Rose. At the time of CapitalWorks' launch of its second franchise location, the defendants created a new franchise – "Sona MedSpas" – that was to replace "Sona Laser Centers" and offer, in addition to hair removal, skin rejuvenation. Amos and Rose told CapitalWorks that it had to sign a new agreement for Sona MedSpas, with higher fees and more onerous terms – including a doubling of capital requirements – in order to benefit from newer, more effective laser technology, and in order to establish the additional centers necessary to maintain its territorial rights. In fact, the franchise offering for Sona MedSpas was unregistered and unlawful, and simply perpetuated and confirmed the misrepresentations made earlier and defendants were actively concealing the fact that SLC and SIC were losing millions of dollars as a result of the Amos Defendants diversion of revenues to themselves. As a result of Defendants' wrongs, CapitalWorks has lost in excess of four million dollars, which it seeks to recover here.

## JURISDICTION AND VENUE

3. This Court has jurisdiction of this matter pursuant to 28 U.S.C. §1332, because the parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs; and venue is proper under 18 U.S.C. § 1391 because a significant portion of the acts and transactions that gave rise to these claims took place here.

## PARTIES

4. Plaintiff CapitalWorks is a limited liability company formed under the laws of the State of Maryland with its principal place of business in Bethesda, MD.

5. James H. Amos, Jr. ("Amos"), a citizen and resident of Tennessee, is the Chairman and Chief Executive Officer and, upon information and belief, a principal owner of SLC. Amos became chairman of SLC in approximately April 2004 when he, together with Carousel Capital, bought a substantial ownership interest in the company. Amos is subject to jurisdiction in this District by reason of his offering and selling franchises here and by committing tortious acts that have caused injury here.

6. Heather Rose ("Rose"), a citizen and resident of Tennessee, is Chief Operating Officer of SLC, and has held that position since approximately April 2004. Rose is subject to jurisdiction in this District by reason of having offered and sold franchises here and by committing tortious acts that have caused injury here.

7. Dennis R. Jones ("D. Jones") is the founder and President of SLC. He is a citizen and resident of Virginia. He is subject to jurisdiction here by reason of having offered and sold franchises here and by committing tortious acts that have caused injury here.

8. Cookie Jones ("C. Jones") is a former officer of SLC. She is a citizen and resident of Virginia and subject to jurisdiction here by reason of having offered and sold franchises here and by having committed tortious acts that have caused injury here.

9. Thomas R. Noon ("Noon") was Chief Financial Officer of SLC from 2002 until August 2004, and since September 2004 has been strategic projects officer. He is

subject to jurisdiction here by reason of having offered and sold franchises to residents in this state and by committing tortious acts that have caused injury here.

10. Sona International Corporation ("SIC") is the parent of SLC and is, upon information and belief, a Virginia corporation with its principal place of business in Chesapeake, Virginia. SIC is subject to jurisdiction here by reason of its having done business here and having offered and sold franchises here. SIC has also committed tortious acts that have caused injury here.

11. Carousel Capital ("Carousel") is an investment banking firm that, upon information and belief, is headquartered in Charlotte, North Carolina. It is subject to jurisdiction here by reason of its having committed tortious acts that caused injury here.

12. Sona Laser Centers, Inc. ("SLC") is a Virginia corporation, with its principal place of business in Franklin, Tennessee. SLC is the corporate franchisor of Sona Laser Centers and, later, Sona MedSpas. It is subject to jurisdiction here by reason of its having committed tortious acts that caused injury here.

**BACKGROUND**

13. The market for enhancement of personal physical appearance is immense; it includes cosmetics, diets, plastic surgery, personal care products, tanning salons, teeth whitening treatments, manicures and hairstyling. The removal of unwanted hair is a substantial part of this market. Until recently, hair removal has been a lengthy, painful and usually futile process. Methods such as shaving, tweezing, waxing, the use of chemicals or electrolysis produce results that may last for a few hours or a few weeks, but that leave the skin rough or sore. Furthermore, these methods do not remove hair permanently either because (as with shaving), they simply

cut the hair, or, if they remove it (as in tweezing or electrolysis) hair grows in cycles – that is, while existing hair may be removed, new hairs are being generated in other hair follicles. Relative success can be achieved only by repeatedly treating an area and completely disabling or deadening all of the follicles over an extended period of time. Older methods of hair removal, such as electrolysis or waxing, that disable or tear out the follicles, do so only after either extremely time consuming processes or with great pain (*e.g.*, application of hot wax to sensitive areas, followed by stripping the wax off, the way a band-aid might be pulled of a young child's arm).

14. Lasers, which generate high energy in the form of light, have the capacity to disable some hair follicles. In lay terms, lasers kill the hair follicles by burning them up. There are, however, a number of limitations inherent in the ability of lasers to remove hair. First, because lasers use light to disable follicles, the hair must be able to absorb the light energy – that is, the light energy must be able to distinguish hair follicles from surrounding skin. For this reason, laser hair removal works best on dark hair growing in light skin. Light hair, such as blonde, red, or gray hair, is "invisible" to the laser. Similarly, dark hair on dark skin is difficult to remove with a laser. Historically, these limitations on laser hair removal have restricted its growth in the marketplace, since competing technologies, such as waxing or electrolysis, can be used on any type of hair or skin. Additionally, like other hair removal processes, laser hair removal does not work in a single treatment. The skin must be treated repeatedly over a period of months so that hair in all of the growth cycles is removed.

15. Despite the hurdles inherent in laser technology, lasers have enjoyed a certain measure of success for hair removal. The technology, moreover, can be used to

"rejuvenate" skin; that is, the laser energy can destroy certain unwanted features, such as spider veins; it can eliminate discolorations; it can kill bacteria, such as acne bacteria, and it can instigate the growth of new collagen.

16. There are currently many venues for laser hair removal or skin rejuvenation. Some of these are independently-operated hair removal or skin treatment centers; some are adjuncts to practices of physicians such as dermatologists or plastic surgeons; some are operated as adjuncts to spas where guests receive an array of personalized treatments, such as massages, facials or mud packs. There are, moreover, many different laser manufacturers who compete to supply outlets such as Sona Laser Centers. The pace of technological advance is very rapid, and any provider of cosmetic lasers services must have current equipment in order to maintain its competitive position.

## SLC ENTERS THE MARKETPLACE

17. Beginning in the late 1990s, Dennis Jones and Cookie Jones founded a Sona Laser Center in Chesapeake, Virginia for the removal of hair by laser treatment. The Joneses made the center similar to a spa as opposed to a doctor's office, with an emphasis on comfortable surroundings and a soothing environment. The Joneses used a brand of laser manufactured by a company called Cynosure. They then licensed the concept to a number of other operators. By the middle of 2002, the Joneses decided to franchise the concept and prepared a Uniform Franchise Offering Circular – a document similar to a prospectus that is required by law to be provided to prospective franchisees – promotional materials, and a Web site.

18. The Joneses had a vision for Sona that went beyond mere franchising. Instead of selling the rights to one Sona Laser Center at a time, they embarked on a program to sell the rights to develop Sona Laser Centers in large geographic territories -- such as a major metropolitan area (e.g., Phoenix/Scottsdale; Cleveland; Pittsburgh) -- to a single developer. That developer would then have the obligation to develop that market by building several Sona Laser Centers over the period of the development agreement.

19. The franchisor, SLC, was bound by law to make disclosures to prospective franchisees consistent with the requirements of the FTC Rule on Franchising, 16 CFR Part 436 and the Uniform Franchise Offering Circular Guidelines. In addition, once a developer executed an agreement to purchase a territory, SLC was bound to make full disclosure to that developer, by proving a disclosure document, in connection with each effort to sell a franchise.

20. Each of the Joneses, Noon, Amos, Rose and Carousel were "control persons" of SLC and, as such, were bound by law and by industry practice in the franchising industry to make the same level of disclosure to prospective franchisees as SLC -- i.e., in accordance with the standards of the Uniform Franchise Offering Circular.

## SLC'S REPRESENTATIONS TO CAPITALWORKS

21. In 2002, Paul Amoruso was investigating business opportunities in the health clinic sector. He was a resident of Washington, DC and was interested in a business that he could own and operate there. Paul was particularly interested in a business that had solid earnings potential and a proven business model.

22. Paul located Sona Laser Centers on a Web site called Bison.com in 2002. The Bison site described the Sona business and, among other things, specifically referred to its technological superiority and the high margins that its franchisees made. In early February of 2003, Paul Amoruso contacted Tom Noon at Sona and spoke with him by telephone at length, and on February 21, 2003, Paul went to Sona headquarters in Chesapeake, Virginia where he met with Dennis Jones, Cookie Jones and Thomas Noon. During that meeting, the Joneses and Noon, on behalf of Sona International and Sona Laser Centers Inc., made numerous oral representations which were then supplemented by written materials or materials on various Web sites.

23. The representations that the Joneses and Noon made included the following:

(a) SLC had developed a proven business model for removal of unwanted hair through laser technology that could be utilized by franchisees with no prior experience in the field and with great success, because it had the "fastest, most powerful laser technology and offered services at much lower fees than competitors." (Ex.1.)

(b) SLC had a <u>patent-pending "revolutionary" concept</u>, that removed 93 to 97 percent of hair in all body areas (with the minor exception of areas under the eyebrow) permanently in five treatments. Dennis Jones specifically said that Sona would offer clients a sixth treatment at no cost if the first five had not removed all hair, but that this was "extremely rare." Defendants further represented that this patent-pending process resulted in hair removal in "less time with better results" and that ensured that franchisees had "a compelling competitive advantage." (Exs. 1, 2, 3.)

(c) When Paul expressed concern that it might not be safe to treat clients who tanned frequently, Dennis Jones specifically said that it would be safe to use Sona's processes two weeks after sun exposure sufficient to tan the skin, and that clients could immediately return to tanning following a treatment.

(d) Sona had two other proprietary technologies that gave it a major competitive advantage: a "Chromo tester" device for measurement

of skin tone, with this device providing operators with an entirely unique capability unavailable to competitors, and a topical anesthetic called "Sonacaine" that minimized any discomfort from treatment.

(e) While other laser hair removal services could not treat blonde, red or gray hair, SLC franchisees had an "exclusive license" for a product called "Meladine" that made light colored hair follicles "visible" to lasers, and that "enables all hair colors to be treated." (Ex. 4.) This exclusive product, proven to be effective in clinical studies, alone would make Sona Laser Centers far more competitive than other laser treatment venues and would increase revenues substantially.

(f) SLC operated at a 55 percent gross profit margin or more (Ex. 5) and achieved break-even with revenues of $44,000 to $50,000 per month. SLC's franchise offering circular showed pro formas reflecting financial results at assumed revenue levels ranging from $50,000 per month to $125,000 per month. Earnings ranged from $288 to $36,240. The same offering circular stated that average monthly revenues were over $65,000; and that at this level, earnings would be $6,768 per month. (Ex. 6.)

(g) Sona's company-owned laser centers in Virginia were profitable.

(h) SLC surveyed, reviewed and tested all lasers on the market, and had selected only the best, state-of-the-art lasers, manufactured by Cynosure, for use by franchisees. Moreover, SLC provided "continuous maintenance and replacements to keep each center a step ahead of the competition." (Ex. 7.) Sona's medical director, Dr. Wilson, had "tested all the skin rejuvenation equipment out there" and the Cynosure equipment was the best unit for this purpose.

(i) SLC had "television, radio and print media materials ... unsurpassed in the industry" that were worth "hundreds of thousands of dollars" and that were made available to the new Sona franchisees, not only for the grand opening, but also for "the ongoing success of the center." SLC would provide hundreds of thousands of dollars in new additional advertising each year as part of base franchise fee (Exs. 7, 8.) In addition, SLC had a "corporate marketing director" and "marketing staff." A grand opening event would be planned and executed by SLC that would included press releases, media packages, radio and television appearances, and an "all out media blitz."

(j) SLC provided world-class, state-of-the-art training "that goes far beyond standard industry practices" so that even franchisees who had no prior experience with the market would be fully trained and able to run their businesses. (Ex. 9.) "There is no more in-depth training to be found." (Ex. 7.)

(k) SLC had custom-designed "world class" software that would facilitate operation of multiple centers including scheduling appointments and managing cash. (Ex. 10.)

(l) The franchise was a "turn-key" operation; that is, SLC delivered a center to the franchisee that was ready to operate, requiring only minimal preparation on the part of franchisees. Moreover, the center could be operated without direct involvement of the owner and entirely through employees; it was suitable for investment by an absentee owner. (Ex. 11.)

(m) Each franchisee would have a dedicated account executive at headquarters who would resolve and be available to assist in resolving any problems or issues. (Ex. 11.)

(n) The franchisees would enjoy a large tax savings due to deferred revenue in the first year of operation.

**PLAINTIFF'S RELIANCE**

24. In reliance upon the representations made by Sona International, Dennis and Cookie Jones, and Thomas Noon, Paul Amoruso decided to purchase the rights to become the area developer of Sona Laser Centers in the Washington, DC market, and used CapitalWorks, LLC as a vehicle for that investment. CapitalWorks would obtain the right and have the ostensible obligation to build and operate Sona Laser Centers in the Washington, DC area. SLC furnished CapitalWorks with a Development Agreement, which CapitalWorks signed in April 2003, pursuant to which it agreed to develop at least 5 franchises and to pay at least the following fees:

A. A franchise fee for each center of $39,500;

B. An area development fee of $10,000 for each center to be developed in the area (such amount to be credited to franchise fees when the center was opened);

C. A training and set up fee for the first franchise $75,000 with additional fees for further centers;

D. A fee for advertising materials of $12,500; and

E. A software management systems fee of $25,000.

25. In addition, SLC required, and CapitalWorks agreed to pay monthly, 27.5 percent of its gross revenues on laser services to SLC. Other fees were to be paid for a national advertising fund, audits, transfer of the franchise and other services or events.

26. SLC further required, and CapitalWorks signed a franchise agreement in April, 2003 with SLC pursuant to which CapitalWorks undertook to open a Sona Laser in Fairfax, Virginia, and SLC agreed to provide certain guidance and assistance in connection with the operation of the franchise. In particular, SLC agreed before the franchise opened, to provide:

(a) Training and set-up services, software management systems, advertisements, furniture and fixtures, office equipment and software, medical supplies and other supplies and equipment for opening the center;

(b) Sufficient training for the owner and up to four other individuals that would be adequate for them to open and operate the center, together with a set of manuals that would enable owners to operate the business;

(c) Assistance with site selection and lease negotiation;

(d) Advice on construction, set up and opening, organizing the business;

(e) Assistance with determining and assessing the local demographics and hiring staff and a medical director;

(f) Assistance with the installing of equipment;

27. In addition, SLC agreed, during the operation of the business, to provide:

(a) Reviews and analyses of the operations of the individual franchisee;

(b) Improvements in administrative bookkeeping, accounting, inventory control, and general operating procedures;

(c) Updates to manuals to incorporate improvements and new developments;

(d) Periodic telephone and electronic mail assistance on daily operations, marketing, advertising, financial management, personnel and other operating issues;

(e) Review of proposed equipment, supplies and service contracts to see if they met the specifications of the Sona system; and

(f) Administration of a system-wide advertising and promotional fund; and

(g) Assistance with laser equipment, servicing, maintenance and repairs.

In further reliance upon the representations that had been made to them, CapitalWorks spent hundreds of thousands of dollars acquiring a location in Fairfax, Virginia, purchasing equipment and supplies, and outfitting its center. It made ongoing agreements with suppliers, landlords and service providers and hired and trained employees. CapitalWorks opened that center in April 2004.

## THE FALSITY OF DEFENDANTS' REPRESENTATIONS

28. Unknown to CapitalWorks until the spring of 2004, when it finally began to discover the truth, the representations that defendants had made to it about the Sona franchise were false. In particular:

(a) The Sona concept was not a proven concept. In fact, Sona's own centers did not achieve the results that Defendants were promising for CapitalWorks' centers.

(b) The SLC pending patent was of no value, and Sona's "proprietary" treatment schedules were based on decades old research and standard practice in the hair removal industry. The Cynosure lasers and treatment protocols that Sona Laser Centers used were not capable of removing 93 to 97 percent of all hair in five treatments. As described below, they were also ineffective to

remove hair that was blonde, red or grey, to remove dark hair on dark skin, or to remove even light brown hair on light skin for many clients. Indeed, even under the best conditions of dark hair and light colored skin, more than five treatments were usually required. In fact, Sona's own internal information showed that on most areas of the body, 7 to 12 treatments were required. Dr. George Wilson, Sona's national medical director, had in fact generated an internal analysis that confirmed this fact.

(c) It is not possible to safely use lasers to remove hair growing in skin that had been tanned within the most recent four weeks, and not safe for clients to resume tanning immediately after treatment.

(d) The "Chromotester" was not a completely unique device of a type unavailable to competitors; in fact, melanin measurement devices operating in the same fashion were available from numerous manufacturers (and have been for many years), and can be ordered by literally anyone. Also, "Sonacaine" was ineffective to relieve pain during treatment for a large portion of clients, and many clients were lost as a result.

(e) Meladine did not make blonde, gray or red hair susceptible to laser treatment; instead, it was simply not effective, as admitted by Sona's own training nurses. Additionally, it was not exclusive or proprietary; SLC sold it to non-Sona Laser operators.

(f) Both Meladine and Sonacaine were manufactured by a separate company owned and operated by Defendant Dennis Jones, who used the franchisees as captive customers, forcing them to buy his products and not permitting the use or resale of competing, more effective products, abusing the franchisor's leverage over franchisees.

(g) The representations that Sona Laser Centers operated at a 55 percent margin and reached break-even at revenue levels of $44,000 to $50,000 per month with 55% profit beyond this revenue level were false. The company-owned Sona Laser Centers in operation at the time of the offering did not achieve the earnings levels purported by Sona. Also, the earnings claims in the offering circular were highly deceptive and premised upon a deliberate distortion and disregard of generally accepted accounting principles and disregard of the Franchisees' obligations. The "margin," "break even" and earnings claims were based on recognizing all cash received in advance for treatments as revenue, without accounting for the cost of providing continuing services. For example, if a customer paid $1,000 in January for five treatments to be delivered over the course of the following year, SLC treated the full $1,000 as

income earned in January, but accounted only for the expense of services rendered in January (*e.g.*, one treatment) in calculating the "margin." Generally accepted accounting principles require that only the portion of the fee attributable to the services rendered in January – *e.g.*, $200 for one treatment – be recognized as income. Defendants, however, presented their earnings claims without disclosure of these facts. The result was that cash flow margins and profits were grossly overstated.

(h) The lasers that Sona made CapitalWorks use, manufactured by Cynosure, were not state-of-the-art lasers, nor were they the best available on the market. Further, the use of these lasers required franchisees to make tens of thousands of dollars in otherwise unnecessary additional investment in the build-out of their centers for items such as augmented electrical systems and air conditioning to accommodate this unreliable and out-dated equipment. In fact, unknown to CapitalWorks, Cynosure had an equity interest in SLC that was not properly disclosed, and Cynosure lasers were used because of the financial benefit such use provided to Cynosure. Further, Dr. Wilson in fact did not "test" any skin rejuvenation equipment prior to the selection of Cynosure equipment for skin rejuvenation services, and this Cynosure technology proved inadequate for providing the necessary range of skin treatments, costing franchisees large amounts of money in lost advertising and equipment fees.

(i) The advertising materials that SLC produced and made available to CapitalWorks were useless; the "marketing director" and marketing departments were incompetent, and there was no grand opening event or materials. In fact, the materials furnished were amateurish and unsuitable for use by CapitalWorks, which had to create its own advertising materials at immense expense.

(j) The training that SLC provided to CapitalWorks was on an amateur level; trainers were not familiar with how to operate laser centers, to operate equipment, or to answer questions.

(k) The software provided by SLC not only was inadequate to assist CapitalWorks in operating its businesses, but was in fact counterproductive. Franchisees were driven to use manual record-keeping and to hire additional staff for this purpose.

(l) The Sona business was not suitable for operation by an investor-owner. Rather, because the training and support was so lacking, it required constant supervision and attention by owners.

(m) Instead of enjoying a large tax savings and positive cash flow, the owners of CapitalWorks accrued a substantial personal liability for pre-purchased treatments and needed to contribute additional capital to their business to maintain its operation.

As noted, however, CapitalWorks did not know, and had no way of knowing, the falsity of these representations at the time of its purchase of the franchise.

## AMOS TAKES OVER

29. In or about April 2004, Amos, together with Carousel, purchased a substantial interest in SLC or SIC. Amos became chairman, and installed his daughter, Heather Rose, as COO. Dennis Jones and Thomas Noon continued as executive officers of SLC. While Amos has had a career in franchising, neither he nor Rose had any background in hair removal or cosmetic procedures.

30. On or about March 27 or 29, 2004, SLC hosted a conference of franchisees at which Amos was introduced as the new Chairman of SLC and representatives of Carousel were introduced as substantial investors. Amos and Carousel announced to the assembled franchisees, including CapitalWorks, that Amos was the former CEO of Mailboxes, Etc., former Chairman of the International Franchise Association, a man of high ethical standards and an executive of proven leadership ability. Under Amos, SLC was going to grow very rapidly; SLC would provide franchisees with national advertising support; the methods that Amos had used to grow Mailboxes, Etc. would be used for Sona, and Sona would become a "household name" within a short period of time, the company would make a public offering of its stock. Carousel was portrayed as a substantial investment bank with deep experience in franchising because it was a large equity owner of Meineke Discount Mufflers.

31. The Franchisees, including CapitalWorks, viewed the arrival of Amos and Carousel as a strong positive development that positioned the Sona concept for immense, long-term growth.

32. Upon taking over SLC and SIC, Amos, Rose and Carousel, together with Dennis Jones and Noon continued to market and sell franchises for Sona Laser Centers with the same representations that they had made to CapitalWorks.

33. Beginning in the spring of 2004, CapitalWorks and other Sona franchisees began to notice discrepancies between the actual performance of their franchises and what they had been told. In particular, the marketing materials that had been promised to them were not useable, and franchisees had to develop their own materials; franchisees were unable to remove 93 to 97 percent of clients' hair in five treatments; Meladine was not working so as to make blonde, red or grey hair susceptible to treatment. Most significantly, franchisees were not achieving the financial results that they had been told: instead of realizing margins of 55 percent, they were incurring immense liabilities.

34. CapitalWorks, through Paul Amoruso, and other franchisees called these shortcomings to the attention of the new owners and executives, Amos, Rose and Carousel.

35. During due diligence calls with Rose in the spring of 2004, immediately upon their acquisition of SLC in June 2004, and across the following several months, Amos, Rose and Carousel were informed that the representations that had been made to CapitalWorks and every other franchisee had been false, and that there was no way that a Sona Laser Center, as conceived and sold to the franchisees, could survive,

much less be successful. In fact, in September of 2004, Paul Amoruso, on behalf CapitalWorks and other franchisees, conducted a multi-hour presentation to the entire Sona management team, reviewing an extensive, detailed and fact-based analysis revealing the faulty economics of the Sona model, with this analysis incorporating the actual operating results of Sona centers around the country and representing weeks of preparation. Nonetheless, because disclosing or admitting the truth to the franchisees would have meant that Defendants would have to disgorge and refund the millions of dollars that they had wrongfully and fraudulently taken from the franchisees, the Defendants instead embarked upon a program to deny, obfuscate and conceal the truth about the Sona technology, the Sona financial model and the Sona franchise. The Defendants, led by Amos, dismissed the analysis as simply pessimistic, and stated publicly that the business model was indeed sound, that he and the management team were fully aware of all aspects of the offering and what they had purchased in Sona, and that any performance issues were solely a function of operator error.

36. At the same time that Amos, Rose and Carousel were telling franchisees that there was nothing wrong with the Sona model, and that the company was going to grow aggressively, they were in fact driving SLC into insolvency by causing it to incur millions of dollars of increased expenses in the form of employee expenses, general and administrative expenses and travel and entertainment expenses -- much of which went for the personal benefit of Amos and Rose. In fact, unknown to the franchisees, and concealed by the Amos Defendants, was the fact that they had embarked upon a program that would take SLC from a profit of over a million dollars for the year 2003 to a loss of over $2 million in 2004 *while revenues nearly doubled.*

37. Throughout this time, Amos, Rose and Carousel were under a duty to make full and complete disclosure of the truth of the Sona system, technology and franchises, as well as its plummeting financial condition, to the franchisees. This duty arose, first, from their positions as control persons of the franchisor; second, from the fact that they had knowledge superior to that of the franchisees, and knew that Sona had misrepresented the franchise system to the franchisees. Third, Amos in particular had held himself out as being an exceptionally honest and ethical person, and publicly undertook to adhere to the highest ethical standards, which standards would require him to immediately disclose to the franchisees the truth of the Sona system. In violation of all of these obligations, Amos, Rose and Carousel deliberately suppressed the truth for their own personal gain, even knowing that this lack of disclosure would severely damage the franchisees, including CapitalWorks.

## SLC LAUNCHES SONA MEDSPA

38. In pursuit of their scheme and conspiracy to cover up the truth about the Sona franchise, SLC's deteriorating financial condition and the personal financial gain they were enjoying at the expense of franchisees, Amos, assisted by Rose, Dennis Jones, Noon, and Carousel, continued to sell franchises on the same basis as before and continued to repeat those false representations on their website, on other websites and in person and in written literature.

39. In the fall of 2004, to rebuff the growing chorus of complaints from franchisees, including CapitalWorks, and to further obfuscate and conceal the fraud they had committed and continued to commit, Amos, Rose, and Carousel announced to the franchisees that they were launching a new concept, "Sona MedSpa," that would

replace the Sona Laser Center concept and that would offer skin rejuvenation in addition to hair removal. The "MedSpa" concept included, in addition to removal of unwanted hair, treatment by laser of aging skin and wrinkles. In order to induce CapitalWorks and other SLC franchisees to remain with the Sona system, and to further suppress the truth, SLC, SIC, Amos and Rose, with Carousel's knowledge and financial backing, made a series of further representations that later proved to be false: (a) laser skin rejuvenation was more than twice as lucrative as laser hair removal and would generate fees of $800/hour per laser, with client acquisition costs comparable to laser hair removal client acquisition costs; (b) Sona had achieved performance levels that would prove out these projections; (c) the technology available from Cynosure was appropriate for these purposes; (d) if franchisees invested in new equipment, they would realize the financial rewards that skin rejuvenation promised. SLC, SIC, Amos, Rose and Carousel made these representations knowing that they were false, in order to conceal the truth and to induce CapitalWorks and other franchisees not to leave the Sona system and to invest further in it.

40. In reliance upon these representations, and believing them to be true, believing Amos, Rose and Carousel in their claims that they intended to rectify the mounting problems and shortcomings in the Sona system, and believing the Defendants' claims that additional scale was all that was needed in the Greater Washington, DC market in order to achieve center profitability, CapitalWorks continued to operate its laser center in Virginia, continued to invest in it, continued to incur liabilities and continued to fund the losses that it was incurring. Also in reliance on these representations, and in order to honor the terms of its area development

agreement with the franchisor, CapitalWorks signed a franchise agreement for a second Sona franchise location in Bethesda, Maryland in October of 2004. CapitalWorks invested in excess of eight hundred thousand dollars in additional capital to build out and launch that center, which opened in January of 2005.

41. To cap off the launch of Sona MedSpas, on or about January 6, 2005, SLC sent all existing franchisees, including CapitalWorks, a new purported "Offering Circular" describing the new "Sona MedSpa" franchise. In conjunction with this offering, the defendants shocked the franchisee community by announcing that developers, such as CapitalWorks, would only be able to fulfill their development obligations to open new franchises by doing so under the new "Med Spa" franchise agreement. That agreement, however, raised franchise fees by $10,000; it doubled the capital requirements; it deleted any obligation of the franchisor to the franchisees; it required franchisees to hire the franchisor's advertising agency for local advertising and was otherwise significantly more onerous than the old agreements.

42. Although SLC offered these new franchises to all existing Sona franchisees, SLC did not register these franchise offerings with any state, as is required. The offering circular, moreover, contained a financial statement that purported to be accurate as of June 30, 2004 and that showed SLC to be profitable. That representation was blatantly false, in that at the time the statement was issued, defendants knew SLC was losing and had been losing millions of dollars. Additionally, the form of the offering circular that SLC sent to franchisees failed to conform to the requirements of law in at least the following respects: (a) the cover page is incorrect and incomplete; (b) the description of the fees to be paid by the franchisee is incomplete

and the notes to this section, in part, are unintelligible; (c) the description of the franchisor's obligations does not correlate with the franchise agreement; (d) no agreement is included for the acquisition of laser equipment so that prospective franchisees may be fully informed of the costs and liabilities they will incur for this expensive equipment; (e) the financial statements are outdated and incomplete; (f) the earnings claims (item 19) are incomplete, incorrect and in violation of law.

43. In reliance upon the representations of SLC, Amos and Rose, all of which had been made with the support, knowledge and backing of Carousel; in reliance upon the January 2005 franchise offering; and in reliance upon the failure of SLC, Amos, Rose and Carousel to disclose all of the material facts with respect to the Sona system, including the facts that the claims that had been made of efficacy of the system, profitability of the franchises, and the proprietary nature of the products and system, were false, CapitalWorks remained as a franchisee of Sona from the summer of 2004 until the present; continued to invest in the system; continued to incur liabilities; and continued to fund the losses that it was incurring , and established its second center in Bethesda, Maryland.

44. Finally, in the winter and spring of 2005, CapitalWorks and its principals began to discover on their own that the Sona business was a fraud. In addition to the fraudulent aspects of the system set forth above, they realized the following:

(a) Because of the complete absence of promised competitive advantages – proprietary technology, ability to treat all types of hair, or to remove hair in five treatments – the Sona system could not be marketed on the basis of Sona's claims (with any honesty) and therefore provided no real differentiation or meaningful source of advantage in the extremely competitive Washington, DC market.

(b) Because customers had purchased "packages" consisting of a number of treatments on the basis of the representations that Sona had made, CapitalWorks faced immense liabilities to clients, either in the form of providing continuing treatments to those who demanded that 93 to 97 percent of their hair be removed, or in the form of refunds because the hair had not been removed in five treatments as promised.

(c) Because of the lack of advertising and support from the franchisor and Defendants, as well as the lack of any ability to compete, CapitalWorks was unable to remotely meet the profitability levels that Sona had characterized as typical.

(d) Because the economic model that Sona had described to CapitalWorks did not account for the liabilities of providing continuing treatments (and completely ignored liability for any treatments beyond five) CapitalWorks encountered increasing liability as time went on.

(e) Amos had been a defendant in a number of lawsuits alleging that he had engaged in franchise or securities fraud, which litigation was material and should have been disclosed in the offering circular.

45. As a result of the Defendants' fraud, misrepresentations, fraudulent omissions and failures to fulfill their obligations, CapitalWorks has lost in excess of four million dollars.

**Invalidity of the Arbitration Clause**

46. The arbitration clause in the franchise agreement is unenforceable and invalid because defendants induced it through fraud; specifically, defendants failed to disclose their intentions to rely upon pre-emptive arbitration; failed to fully disclose its implications in light of the Virginia and Maryland Franchise Acts; and failed to fully inform plaintiff of the status and financial condition of the party with whom it was dealing, SLC. The arbitration provision, in any event, does not by its terms apply to any party other than SLC.

**COUNT ONE**
**(Common Law Fraud)**

47. Plaintiff repeats and realleges each and every prior paragraph of this Complaint as though set forth here in full.

48. A Defendants made material misrepresentations of fact, material omissions of fact, and engaged in deceptive acts and practices, as set forth above, in connection with and in order to induce the sale of the Sona franchise to CapitalWorks and in order to induce CapitalWorks to remain as a Sona franchisee and to continue to invest in it and fund its losses. To summarize defendants' wrongdoing:

(a) SIC, the Joneses and Noon misrepresented the franchise offering and the characteristics of the Sona technology and capabilities in order to induce CapitalWorks to purchase the franchise and development territory, as set forth in paragraphs 23 and 28 above.

(b) SIC, the Joneses and Noon continued to misrepresent the franchise offering and characteristics of the Sona technology and capabilities after the purchase of SLC, and conspired with and facilitated the concealment of the truth with Amos, Rose and Carousel.

(c) Amos, Rose and Carousel misrepresented the characteristics and capabilities of the Sona "MedSpa" franchise; misrepresented the financial condition and capabilities of SLC -- painting it as a robust, financially healthy entity when it was in fact insolvent; concealed the fact that they were personally enriching themselves at the expense of plaintiff and other franchisees; engaged in the unlawful offer of the Sona Med Spa franchise and both failed to disclose the truth, when they had a duty to do so,

and actively suppressed the truth about the characteristics and capabilities of the Sona franchise and technology.

49. These Defendants knew that their representations, omissions, suppressions and deceptive acts were false; they engaged in this deceptive activity knowing that their words and actions were false and misleading; and with the intent that CapitalWorks rely upon them, that it purchase the area development rights to Washington, DC; and that it sign franchise agreements for and build locations in Virginia and Maryland.

50. CapitalWorks reasonably relied upon these defendants' representations, omissions, suppressions and other deceptive acts in deciding to purchase the development rights and franchise for Sona; in paying hundreds of thousands of dollars in fees to SLC; in investing hundreds of thousands of dollars for real estate, equipment, supplies, training, promotion, advertising and employees; and in expending hundreds of thousands of dollars continuing to operate a system that was structurally flawed and unprofitable.

51. Defendants SIC, Amos, Rose, Noon, Dennis and Cookie Jones made continuing misrepresentations throughout the summer and fall of 2004, by, among other things, denying that there were any problems with the Sona franchise or concept, and blaming the problems on CapitalWorks and other franchisees.

52. These Defendants' representations were false, and as a result of CapitalWorks' reliance upon Defendants' representations, CapitalWorks has suffered damages in excess of four million dollars.

53. Defendants acted intentionally, with deliberate disregard of the rights of CapitalWorks and other franchisees, with the knowledge that their fraud would severely injure the franchisees while it enriched them. Defendants' acts were reprehensible and egregious, to the extent that they should shock the conscience of the Court.

54. CapitalWorks is entitled to an award of actual damages in excess of four million dollars, plus punitive damages in excess of $10 million or such amount as shall be sufficient to deter them from such conduct in the future.

**COUNT TWO**
**(Negligent Misrepresentation)**

55. Plaintiff repeats and re-alleges each and every prior paragraph of this Complaint as though set forth here in full.

56. Defendants had a business relationship with plaintiff such that they were required, in conscience and good faith, to take due care to ensure that the information communicated to plaintiff was truthful, accurate and reliable, and did not omit any material information.

57. Plaintiff relied upon the information furnished by Defendants in the belief that it was truthful and reliable, in deciding to purchase, invest in and operate a Sona Laser Center.

58. Defendants failed to exercise reasonable care in the information that they provided to Plaintiff and in fact unreasonably provided plaintiff with unreliable and misleading information, which plaintiff relied upon to its detriment.

59. As a result of plaintiff's reasonable reliance upon defendants' misleading information, plaintiffs have sustained damages in an amount no less than four million dollars.

## COUNT THREE

## (Violation of the Maryland Franchise Act)

60. Plaintiff repeats and re-alleges each and every prior paragraph of this Complaint as though set forth here in full.

61. The Maryland Franchise Act provides that a person who sells a franchise is civilly liable to the person who buys the franchise if the person who sells it does so by means of an untrue statement of a material fact, or an omission to state a material fact.

62. In connection with the sale of the franchises to the franchisees, SLC and all Defendants made misrepresentations of material facts and omissions of material fact, as set forth above, and sold the franchise to CapitalWorks.

63. In addition, the Maryland Franchise Act provides that joint and several liability for franchise violations extends to each person who directly or indirectly controls a person liable under the act; to each principal officer or director of a corporation liable under the act and to each employee who materially aids in the violation.

64. Separate and apart from their primary liability for violation of the Maryland Franchise Act, Carousel is liable under the Maryland Franchise Act as a control person of SLC; the Joneses, Noon, Amos and Rose are liable under the Maryland Franchise Act as principal officers of SLC.

65. If Defendants had not made the misrepresentations of fact, omissions and artifices to defraud, as set forth above, CapitalWorks would not have purchased franchises for Sona Laser Centers and would not have incurred the losses that they have now sustained.

66. Plaintiff is entitled to rescind its franchise purchases and to recover restitution from Defendants, plus costs and attorneys fees.

**COUNT FOUR**
**(Civil Conspiracy)**

67. Plaintiff repeats and re-alleges each and every prior paragraph of this Complaint as though set forth here in full.

68. Defendants Amos, Rose, Carousel, the Joneses and Noon, when confronted with the complaints of franchisees about the Sona technology and system in the Summer and Fall of 2004, embarked upon and engaged in an unlawful civil conspiracy, in that they agreed amongst themselves unlawfully to suppress the truth with respect to Sona Laser Center Franchises and the efficacy of Sona treatments. They carried out this conspiracy by denying that there were any problems with the Sona system; by blaming problems on the franchisees; and by undertaking to launch the "Sona MedSpa" system as a cover-up for the grave deficiencies of the Sona Laser Center system.

69. As a result of Defendants' conspiracy, CapitalWorks was prevented from learning the truth when it should have, in the Spring of 2004, and because of the conspiracy, it continued to invest in and lose money in its Sona franchise when, if defendants had not conspired and instead had disclosed the truth, it would have been able to cease operations or change operations in such a way as to reduce the losses that it incurred.

70. CapitalWorks is entitled to recover the damages it incurred as a result of defendants' conspiracy.

WHEREFORE, CapitalWorks demands judgment as follows:

a. An award of its actual damages sustained, but in no event less than $4 million;

b. An award of punitive damages against each defendant of no less than $10 million;

c. An award of attorneys' fees;

d. Costs, disbursements and such other and further relief as the Court deems just and proper.

PLAINTIFF PRAYS A TRIAL BY JURY

Dated: August 3, 2005

NEUBERGER, QUINN, GIELEN,
RUBIN & GIBBER, P.A.

By: ______________________
Allan P. Hillman
Bar No. 00119
One South Street, 27th Floor
Baltimore, MD 21202-3282
PH: (410) 332-8542
FX: (410) 332-8594

DADY & GARNER, P.A.

By /s/ W. Michael Garner
W. Michael Garner
4000 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
PH: (612) 359-9000
FX: (612) 359-3507

ATTORNEYS FOR PLAINTIFF